## Terry et al. v. Ellsworth et al.

(Decided November 14, 1930.)

R. M. SHELBOURNE and D. H. HUGHES for appellants.

GARDNER & McDONALD and JESSE F. NICHOLS for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

L. T. Jennings married Susan Markle. On December 13, 1880, he purchased from J. M. Moyers 58 acres of land for $500, paying down $150, the remainder of the price to be paid December 25, 1881, and December 25, 1882. He and his wife had three children, Thomas Jennings, Louis E. Jennings, and Maud Jennings, now Maud Ellsworth. Susan Jennings, the wife, had received from her father's estate about seventy-five or one hundred dollars. She died some years later. After her death, Jennings married again. By his second wife he had three children, Belle Jennings, who married F. R. Terry; Beulah Jennings, who married Arthur Todd, and Nona Jennings, who married G. E. McClure. L. T. Jennings was a farmer, and lived upon the farm. In the year 1919 he sold the land to his son-in-law F. R. Terry, and on October 23, 1920, he and his wife executed a deed to Terry for the land for $3,931; $940 cash in hand paid, the remainder to be paid in one, two, three, and four years. L. T. Jennings died on August 23, 1924, leaving a will by which he devised his estate to his son Louis and his three daughters, by the last marriage, equally. The will was duly probated. A. R. Todd qualified as the executor of the will, and, after paying the cost, distributed the estate to the four devisees. He filed his settlement, which was

56

confirmed by the court. Each of the devisees received something over $1,000 from him. On October 25, 1926, Thomas Jennings and Maud Ellsworth, two of the children by the first marriage, who got nothing under the will, brought these actions. They alleged, in substance, that the land belonged to their mother, Susan Jennings, and at her death descended to them by virtue of the following writing:

"This indenture of writing and article of agreement made and entered into this March 29, 1881, by and between L. T. Jennings, Jr., party of the first part, and his wife, Susan Jennings, party of the second part, all of the county of Ballard and State of Kentucky, Witnesseth: That for and in consideration of the love and affection I have for my wife and also for the sum of eighty-four dollars, which she got from her father's estate, cash in hand the receipt of which is hereby acknowledged, the party of the first part do by these presents grant, bargain, deed, sell and convey to the party of the second part her children a tract of land in Ballard County, Kentucky. (Here follows description.) It is agreed to by the parties of the first and second part that the said L. T. Jennings, Jr., may reside upon, have and hold this land and the products grown on it and the crops he cultivates on it as long as he may live.

"Witness our hands the day and date first above written.

                    "(Signed)   L. R. Jennings, Jr.
                                  first party.
                                     her
                        "Susan  x  Jennings
                                   mark

"Witness my hand this 29 day March 1881.

                                        "Wm. White

"Witness:
"John Markle
"W. H. Wilson
          her
"Bell  x  Wilson
        mark
"Tom Wess Jennings
                    her
"Georgia Ann  x  Jennings."
              mark

They also charged that Terry bought the land with notice of their rights and took subject thereto. Terry had not paid the balance of the purchase money when his father-in-law died. He then made a mortgage to a bank on this land and some other land he owned, and borrowed enough money to pay for the land. He then paid the money to the executor, who distributed it and filed his settlement eight months after the death of the testator. The defendants pleaded, in substance, that the above paper was a forgery, that they had no notice of it, and that the plaintiffs were estopped to set up the claim against them because they allowed the old man to sell and Terry to buy without any objection on their part or notice of their claim. The bank asserted its lien; the property was ordered sold; all of the property covered by the mortgage was sold. After paying the debts of the bank, only $95 was left. The court under the proof entered judgment for Maud Ellsworth and Thomas Jennings against the defendants for their costs and for two-thirds of $2,350, the amount which this tract of land brought at the commissioner's sale. From this judgment the defendants appeal, and the plaintiffs prosecute a cross-appeal.

Thomas Jennings testified that in the year 1904 Dr. Graves, who was a brother-in-law of John Markle, gave him the paper, saying, "Here is a paper I found among your uncle John Markle's papers." He did not know anything about the paper until Dr. Graves handed it to him, but he had kept it from that time. He testified that, when Todd was about to buy the place, he told him that his father could not sell his place; that he had a paper about this place; that his father could not sell it. He at no time showed the paper to Todd or any of the family. He also testified that at one time he gave the paper to his attorney, J. F. Nichols, and Nichols had it for three or four days.

W. H. Wilson, who married a sister of Susan Jennings, testified that he was present when the paper was executed; that Jennings and all of the witnesses signed in his presence. He did not know who wrote the paper, but, after it was written, it was handed to John Markle to keep until Jennings' death and to be delivered to his heirs then. He also testified that all of the other witnesses to the paper signed in his presence, but that all the others were dead. He also said that White, the

deputy clerk, told them it was not necessary to record the instrument because it did not take effect until the old man's death.

Henry Wilson, who was a first cousin of Thomas Jennings, testified that he was present and saw Dr. Graves hand the paper to Thomas Jennings in 1904, and that Graves said then, "Here are some papers that I have found in Markle's papers; take care of them, they might do you kids some good."

Jesse F. Nichols, an attorney for the plaintiff, testified that Thomas Jennings brought the paper to him, and after this he saw L. T. Jennings on the street, and told him that he would like for him to come up to his office. He came up, and he told him about seeing this paper. He did not then have it. He had given it back to Thomas Jennings, and Jennings asked him to let him look at it. In two or three days, and before he saw Thomas, L. T. Jennings came back and said he would give Thomas $800 if he would give him the paper. He told Thomas, and Thomas said he would not let his sister or brother lose their interest. After this, he had a conversation with F. R. Terry, and told him he had seen the paper. Terry said that he was going to investigate it, and afterwards told him that he had investigated it, and that there was none on record, and the lawyer told him that the title was all right. On the other hand, Terry testified that he had never heard of the paper until after he had bought the place, then he heard a rumor about it, and he had John E. Kane, an attorney, to examine the title, and that he pronounced it good. The defendants proved by a number of witnesses that, after this rumor started, the old man said time and again that there was no such paper, that it was all Tom's talk, and that Tom and Nichols had made it up, and they proved by one witness that there was a loud dispute between the old man and Nichols on the street, but the witness did not hear it all. They proved by one or two witnesses that after this rumor started W. H. Wilson said that he knew nothing of such a paper, but he denied making these statements. He was eighty-five years old. His sons, fearing that his mind was bad, applied for a committee to be appointed for him, but dropped the application. It was proved by several witnesses that the old man's mind was bad. He admitted that he had not seen the paper from 1881 until 1926. The defendants introduced a good deal of evidence to the effect that the signature of L. R. Jennings to the paper

was not his signature, and that the signature of William White was not his signature. They also introduced some proof that Thomas Jennings had said that he could take any signature and trace it under a glass; also that he was a great talker and joker, and that his reputation for this was such that little dependence could be placed upon what he said.

These facts are undisputed. L. T. Jennings sold part of the land off for grave lots in 1897, but Thomas Jennings says that this was before he knew of the deed. John Markle died in 1901. He left little or no property and some infant children. Dr. Graves, who was a brother-in-law, helped to take care of the children, and looked after things, though he did not qualify as administrator. Dr. Graves died in 1912; none of his family ever heard of this paper. Neither did Louis Jennings, or Maud Ellsworth, who lived with her father until she was married in February, 1919. After the sale to Terry, she lived with Terry, in the summer of 1920, and while there told Terry and his wife that she was very glad they had bought the place, and was glad for them to have it. She explained this later by saying that she at that time had not seen the paper and did not know its contents. On April 8, 1919, Jennings had his lawyer to write his will for him, which was duly executed. By this will he left the property to his wife for life and at her death to be equally divided between all of his children. In the fall of 1919, he moved from the farm to Bardwell after selling the farm to Terry. But the deed was not made until October 23, 1920. Thomas lived on the place with his father until his father left. He continued on the best terms with his father from that time until the spring of 1923. In all that time he did not bring home to his father or to Terry any further objection to Terry's buying the place. In other words, in something over two years nothing was said about it. In the spring of 1923, the bank held a number of notes which Thomas had executed with the names of others on them as his surety. There were over eleven of these notes. The sureties made affidavit that they had not signed them, and Thomas was indicted for forgery. On March 4, 1923, after failing to raise the money to pay off these notes by a mortgage on his land, and after the indictment against him was returned, he (as he says at his father's suggestion) left Kentucky and went to Arkansas. From Arkansas he went to Canada.

From Canada he returned to Toledo, Ohio, and remained there. He did not hear from his home folks until July, 1924. On November 20, 1923, the father made a will revoking his former will and devising his property to Louis and to the three daughters by the second marriage. The father died on August 23, 1924. The will was duly probated on September 10, 1924. The executor made his settlement on April 11, 1925, and it was confirmed on May 11, 1925. Thomas returned to the county in October, 1926, bringing the paper with him, and then this suit was brought on October 25, 1926.

The defendants introduced considerable proof to the effect that the claim set up by Thomas Jennings was that his mother's money had paid for the land, and that it should therefore go to her children. But the old man always claimed that she had paid on the land only about $75 in the first payment, and that he had afterwards paid this back to her.

According to the proof for the defendants, this claim was first set up by Thomas after the deed was made, and that Terry then asked his attorney, John E. Kane, to look up the title, and, after the attorney reported the title all right, they heard nothing more of this claim until it was asserted in these actions, when for the first time the paper was produced.

The old man offered to sell the place to two other parties before he sold it to Terry in the fall of 1919, and moved to Bardwell. One of these parties came back to him a few days later to buy the place, and he told him he had sold the land to Terry. No one in the family or in the neighborhood, as appears from the proof, had then heard of the paper in question. The original paper has been brought up with the record, and bears on its face strong evidence that it (including signature) was all written at one time by the same hand and in the same ink. The court is satisfied upon the whole record that, if L. T. Jennings had not revoked the will made in the spring of 1919, this controversy would never have arisen.

The weight of the evidence shows that the claim made by Thomas Jennings was that his mother's money had paid for the place, and that therefore his father had no right to sell it. He had at no time showed the paper to his father or Terry or any of the family or told them it was not recorded or what was in it. The whole objection was in substance based upon what Thomas said, and

he at no time produced anything to back up what he said. When he made this claim, Terry had the title examined by a lawyer. After the lawyer reported that the record title was good, and that there was no trouble about it, Thomas Jennings, so far as appears, said nothing further. He did not produce the deed or say that there was anything outside of the record to sustain his claim. He continued on good terms with his father, living with him until he moved to Bardwell, and afterwards living nearby and on intimate terms with Terry and his wife, and frequently at their house. Nothing further was said about this claim, although he knew that Terry had bought the property, made a payment on it, and was holding it as his own. He had not communicated to his brother Louis or his sister Maud anything about the paper. In this condition of affairs he left the state in 1923. His father died in August, 1924. He knew then, if his paper was genuine, that he was entitled to an interest in this piece of land. But he took no steps to assert that interest. The executor of the will qualified in September, 1924, and in the spring of 1925 Terry paid the executor the full balance due on the place by making a mortgage to the bank and borrowing the money. Up to this time nothing had been heard from Thomas Jennings or of the paper, and nothing was heard of it until he returned to the state in 1926, and brought the paper with him, and then for the first time produced it, so that anybody could see it. Then all the subscribing witnesses, except W. H. Wilson, were dead. Stale claims are not encouraged. It is the policy of the law that title should be made a matter of record, and bona fide purchasers of property are not bound by a matter not of record, unless they have notice of such facts as would put a reasonable man on notice. When a man buys property and pays for it, it is reasonably presumed that he had no notice of an infirmity in the title, for men do not usually take such risks. Under all the facts here the court concludes that Terry bought this property and paid for it without notice of the paper in question, and that his title should not be disturbed. Any lawyer would have advised Thomas Jennings that this paper should be recorded to be valid against innocent purchasers.

"Where an owner neglects to record his title, every presumption is in favor of a subsequent purchaser, and vague and indefinite recitals are not sufficient notice to put him on inquiry outside the record." Pyles v. Brown,

189 Pa. 164, 42 A. 11, 13, 69 Am. St. Rep. 797; also notes, 67 Am. St. Rep. 321.

In such cases the loss, if any, should fall on the party who has failed to have his deed recorded and not on a good-faith purchaser, for value. McEwen v. Keary, 178 Mich. 6, 144 N. W. 524, L. R. A. 1916B, page 1063.

Holding that mere notice that improvements are being made on the property without knowledge of the nature of the contract under which the work was done was insufficient, the court in Kentucky Lumber Co. v. Kentucky Title Co., 184 Ky. 244, 211 S. W. 765, 767, 5 A. L. R. 391, citing previous cases, said:

"The notice, which appellee must have had, to render its lien subordinate to appellants' liens, must have been an actual notice, as distinguished from the constructive notice, which appellants might have made effective by filing in the clerk's office, prior to the recording of the mortgage, the preliminary statements of their work or materials furnished, or of their intentions to work or furnish materials."

This is applicable here, for Thomas Jennings' statement as to what he told Terry is very indefinite, and Terry's version of it is sustained by the subsequent conduct of both the parties. He did not on his own version of what he said tell Terry about the contents of the paper or when it was executed or where it came from or that it was not recorded, or state any facts to put Terry on notice of the paper, and without some such facts Terry had the right to act as he did. Our system of registration of title to lands is so effective, so simple, and so well understood, that, as is well settled, the court is disinclined to favor latent claims founded on the neglect of well-known statutory provisions as against purchasers for value; and, when the good-faith purchaser has inspected the record, where evidence of titles and liens should be recorded, and finds nothing there informing him of the outstanding equity, his vendor being in possession, he should be protected. Were the rule otherwise, it would never be safe to buy land from a man having title of record without an investigation to ascertain whether or not some one had an unrecorded deed to the land. Fields v. Stamper, 177 Ky. 323, 197 S. W. 919; Carrier v. Kavanaugh, 198 Ky. 25, 247 S. W. 1107;

Philips v. Hopkins, 208 Ky. 769, 271 S. W. 1075; Jackson v. Engle, 230 Ky. 558, 20 S. W. (2d) 460.

As to Mrs. Ellsworth, clearly Terry was a bona fide purchaser without notice, for he bought and paid for the property with her consent and approval when she knew nothing of the paper in controversy. As to Thomas Jennings, the result is the same; for what he told Terry was not notice of an unrecorded paper affecting the title, and by his conduct, after the lawyer pronounced the title good, he acquiesced in Terry's purchase of the property from his father. He, after March 4, 1923, with the help of Mrs. Ellsworth, paid the notes charged by the sureties to be forgeries as to them, except one which his father paid as his surety, and the indictment against him was dismissed.

Under all the evidence, the court concludes that Terry is a bona fide purchaser of the property for value, that the facts known to him were not sufficient to constitute notice to him of the paper in controversy, and that appellants were by their conduct estopped to assert same against him when the suits were filed.

The record did not warrant any judgment in favor of the appellees, and on the cross-appeal the judgment of the chancellor cannot be disturbed, but on the original appeal the judgment is reversed, and the cause is remanded for a judgment dismissing the plaintiff's petition with cost.